Kaplan, Mitchell H., J.
A Suffolk County grand juiy returned indictments against the defendant, Robert A. Forrest, Jr., for making materially false statements in applications for salvage titles, conspiracy and bribery. The case is before the court on the defendant’s motion to suppress statements made by him on June 15, 2010. An evidentiary hearing was convened on November 16, 2010. The Commonwealth presented the testimony of Detective Captain Kevin Butler. Beverly Forrest, the defendant’s wife, testified on his behalf. Nine exhibits were admitted in evidence. For the following reasons, the motion is DENIED.
FACTS
In consideration of the testimony presented and exhibits admitted in evidence, the court makes the following findings of fact.
The defendant is 62 years old. He was a Massachusetts State Trooper. For a period of years, exceeding eight, prior to the events at issue in this case, he was assigned to the Massachusetts Auto Theft Salvage Unit. A part of his job involved inspecting automobiles that had been reported as “totaled” and thereafter repaired to determine if the repairs had been properly completed without the use of any stolen parts. To do this, among other things, a trooper assigned to this detail must physically inspect the car. If the car passes inspection, the trooper signs a Salvage Inspection Form (the Form) that permits the owner of the automobile to register the vehicle with the Department of Motor Vehicles and return it to the road.
On March 6, 2009, Capt. Butler was assigned to investigate alleged wrongdoing in connection with the issuance of these Forms. Capt. Butler has been a member of the Massachusetts State Police for thirty years. He commands the state office of investigations *572 and supervises some two hundred detectives. He previously worked in internal affairs and has been involved in the investigation of many police officers, both as an officer in internal affairs and as a captain with the state office of investigations. Capt. Butler received information that the defendant had signed Forms for vehicles that he had not inspected. It was also believed that Kenneth LaFauci, the operator of Brother’s Auto Body in Revere (Brother’s), was involved in the unlawful scheme. On March 15, 2009, an initial meeting took place to plan a “sting” to investigate this suspected wrong doing. The defendant was a target of the proposed sting.
Some months later, a sting was planned to occur on June 15, 2009 with the assistance of a confidential informant. The sting involved having the defendant sign a Form for one or more fictitious “totaled” automobiles. The confidential informant was to pose as someone looking to obtain executed Forms for unin-spected vehicles. He was given ten one hundred dollar bills to pay for Forms on fictitious automobiles. The planned sting called for a middleman, who was part of the unlawful conspiracy, to obtain the signed Forms from Brother’s and then deliver them to the informant. On June 15, 2009, the defendant, the confidential informant, and Brother’s were placed under surveillance. Beginning at 12:30 p.m., the defendant was followed by Detective Captain William Christiansen, as he left his duty station at the Revere Department of Public Works, traveled to Brother’s, and then to his home at 46 Pond Ave in Stoneham, where he arrived at 2:25.[1] Capt. Christiansen maintained surveillance until other officers involved in the sting alerted him that a Form for a fictitious car signed by the defendant had been recovered.
At 4:40 p.m., Capt. Butler, Capt. Christiansen, Detective Major James Hannafin of the Massachusetts State Police, and Lieutenant Michael Griffin, who was the defendant’s supervising officer, gathered outside 46 Pond St. Each arrived in his own car. None of them was in uniform. Although they were armed, their service firearms were not visible. 46 Pond is a two-family residence located on the corner of Pond and Summer Streets. This is a busy intersection with a light at the corner. There is no place to park in front of the residence and the driveway accommodates four cars. When the officers arrived, the defendant’s cruiser was parked in the driveway next to his wife’s car. Capt. Butler parked his car in the driveway, and at least two of the other police pulled their cars into the driveway in some manner, effectively blocking it.
The defendant lived on the second floor of 46 Pond. Capt. Butler and Major Hannafin went to the defendant’s front door and rang the bell (which apparently did not work) and then knocked with increasing force at the front door. Lt. Griffin knocked on the back door.[2] Eventually, the defendant came to the front door. He had changed out of his uniform. Major Griffin greeted him at the vestibule. The Major asked the defendant to step out into the driveway so that he could introduce the other three officers who were standing there. After introductions, Capt. Butler asked the defendant why he had gone to Brother’s that day. The defendant said that he had signed off on paperwork for a friend. Capt. Butler asked to see it, and the defendant went inside to get the key to the trunk of his cruiser. Documents were taken from the trunk. They included forms associated with the fictitious “totaled” car. Capt. Butler asked the defendant why he was doing favors for LaFauci. Butler responded that some years ago, LaFauci had done ten thousand dollars of body work on an old Plymouth Barracuda for him, but only charged him three thousand dollars and therefore he owed LaFauci a favor. After about five minutes of conversation, Capt. Butler asked the defendant if he wanted to continue to talk in the driveway or would prefer to continue the conversation inside. The defendant said that he preferred to go inside.[3]
The group went into the defendant’s second-floor apartment. His wife was inside preparing dinner. The apartment was of modest size. It had a kitchen/dining area, television room and bedroom. The defendant offered that he might have some documents pertaining to the Barracuda in his bedroom and walked into the bedroom. Capt. Butler and Major Hannafin followed him in, Lt. Griffin stood at or nearby the doorway; and Capt. Christiansen stayed in the hall speaking on his cell phone. The bedroom was approximately twelve by twelve and had a queen-sized bed, dresser and television in it. Capt. Butler, at some point sat on the bed, while Major Hannafin and the defendant stood during the interview that followed, which lasted about an hour.
The defendant said that he received a call from LaFauci at 10:30. Someone went into the kitchen to retrieve the defendant’s cell phone. The defendant permitted Major Hannafin to scroll through the numbers of the incoming calls and the defendant pointed out LaFauci’s call, which was actually received at about 12:30, shortly before the defendant left the Revere DPW. Capt. Butler asked the defendant if he had received money for signing the Form that day. The defendant said that he hadn’t and permitted Capt. Butler to go through the pockets of his uniform that was then on the floor; they held no money. The defendant also handed over his wallet that had a fifty and two one-dollar bills in it.
Capt. Butler continued to press the defendant on whether he had taken money for signing Forms. At some point, the defendant changed his answer and said that he had signed-off on paper work inappropriately for LaFauci some 18 to 20 times over eight years and had accepted money for doing so four times. When confronted with an inconsistency in his statements concerning how long he had known LaFauci, the defendant said that he was confused; which prompted *573 Major Hannafin to comment: “You might not be confused if you just told the truth.”
Capt. Butler stated that he did not believe the defendant concerning how much money he had taken from LaFauci and told the defendant that he had given $1000 to the informant that day. The defendant then said words to the effect that he had not received anything near $1000, but had been paid fifty dollars that day for signing the Form.
Near the end of the discussion, Capt. Butler told the defendant that he was going to report to the State Police Colonel what the defendant had said that day. He also stated that he did not believe that he was being told the truth. At that point, the defendant threw up his hands and said that he had been paid for signing Forms. He admitted that he had been paid for signing Forms more than twenty times and received $50 for every fraudulent Form that he signed.
Capt. Butler then brought Lt. Griffin into the bedroom. Lt. Griffin told the defendant that he was being placed on administrative duty until a duty status hearing could be held. He was told to turn over his badge, firearms and other use of force equipment. Arrangements were made to tow the defendant’s police cruiser from the driveway. The four officers then left the apartment at 5:50 p.m. The defendant was not placed under arrest.
Capt. Butler asked ninety percent of the questions during the interrogation; Major Hannifin occasionally interjected a comment or question. Capt. Butler testified that neither of them raised his voice during the interrogation. Mrs. Forrest testified that she heard the two officers in the bedroom “screaming,” presumably at the defendant, for several minutes. She, however, also testified that she did not hear anything that they said. The court does not find that credible. While it may be that the officers were at times assertive in their questioning, it is not possible that either yelled at the defendant in the small apartment, but that Mrs. Forrest could not hear anything that either of them said. I find that the officers did not scream at the defendant.[4]
The four officers were large men. They did not, however, at any time exert or threaten any physical force, nor did they threaten arrest, make promises of lenient treatment for voluntary responses, or use any manner of deceit. On the other hand, they also never said anything to the defendant to the effect that he did not have to answer their questions or that they would leave the apartment if asked to do so.
DISCUSSION
The defendant has moved to suppress his statements to the officers on the grounds that (1) he was in custody during the interrogation and never received Miranda warnings, and/or (2) the statements were not made voluntarily. The court finds that the principal, and very difficult, issue presented by this case is “whether, considering all the circumstances, a reasonable person in the defendant’s position would have believed that he was in custody.” Commonwealth v. Sneed, 440 Mass 216, 220 (2003) (internal citations omitted).
“Although the inquiry undoubtedly encompasses a subjective element, for it requires a court initially to examine the coercive elements of the particular questioning session from the point of view of the person being questioned, its ultimate resolution depends on how a reasonable person would feel in those circumstances.” Id. There are four criteria that a court should consider in making this determination: “(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e., whether the interview was aggressive or, instead, informal; and (4) whether, a the time the incriminating statement or statements was made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively whether the interview terminated with the defendant’s arrest . . . There is no specific formula for weighing the relevant factors, but rarely is any single factor conclusive.” Id. (Internal citations and quotations omitted.)
In this case, the court finds that the “subjective element” is particularly important. The defendant was a state trooper. Certainly, he knew that he had a right not to answer the questions posed to him and to tell the officers to leave his home. Capt. Butler’s first comment, which asked why the defendant left his assigned detail at the Revere'DPW to go to Brother’s, made clear to the defendant that the officers were there because they were concerned with the performance of his duties as a state trooper assigned to the salvage unit. As he knew that he had just signed a Form at Brother’s for an automobile that he had not seen, let alone inspected, he might well have believed that it was in his best interest not to tell the officers to leave, but rather to answer their questions and perhaps minimize their concerns as to the extent of his malfeasance. The question to be resolved is whether a reasonable person in the defendant’s position, that is a state trooper confronted by his superior officers with evidence of dereliction in the performance of his official duties, would have believed that he could tell the officers to leave his home. The court concludes that such a reasonable person would understand that he did not have to answer the questions, but could direct the officers to leave. While the presence of four large and senior officers in his home would be disconcerting, they neither did nor said anything to suggest that they were not going to leave unless he answered questions. A reasonable person in the defendant’s position might well believe that he would be promptly relieved of duty if he chose that course of action, and his conduct be subject to further investigation, but *574 that reasonable belief does not transform the interrogation at his home into a “custodial” interrogation. See id. at 222.
As to voluntariness, there is no evidence that the defendant’s will was overborne by any coercion exerted on him.[5] The officers did not threaten arrest, offer immunity or leniency, or engage in any manner of deceit during the interview. To the contrary, Capt. Butler was forthcoming concerning the evidence that was revealed by the sting. He knew the defendant had signed a Form for a car that did not exist, but did not yet have evidence that the defendant had accepted a bribe, although he frankly stated his belief that the defendant accepted money for his signature on Forms. Compare Commonwealth v. Coleman, 49 Mass.App.Ct. 150 (2000).
ORDER
For the foregoing reasons the defendant’s motion to suppress is DENIED.

 It had been anticipated that the defendant would return to the Revere DPW, as his shift ran until 3:45, and that he would there be directed to come to the Revere barracks to be interviewed.

 Mrs. Forrest, who was in the kitchen, saw Lt. Griffin at the back door, but told him that the defendant was on his way to the answer the front door. There is no evidence that the defendant was aware that Lt. Griffin and Mrs. Forrest had any interaction.

 The interview was not recorded. Capt. Butler had an audio recording device in his car, but did not retrieve it.

 There is no evidence that Mrs. Forrest heard anything that her husband or the officers said to one another or that she engaged in any communication with any of them.

 Mrs. Forrest testified that the defendant had “high blood pressure, stomach problems and heart issues.” She also testified that he broke down and cried after the officers left. The court finds that these non-specific health issues did not make him so vulnerable that his free will was overborne. To the contrary, it seems that while he was nervous and upset during the interview, he was able to maintain his composure until the officers left his apartment.